## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO. _____

Humam Sarmad Saad AL-SAADI, an
individual; and CELEBRITIES CENTER
FOR GENERAL TRADING COMPANY,
LIMITED, a foreign company,

       Plaintiffs,

  vs.

ANNCHERY FAJAS USA, INC. a Florida
corporation; ANNCHERY USA, INC., a
Florida corporation; and ANN CHERY
BEAUTY, INC., a Florida corporation
inclusive,

       Defendants.

_____/

## COMPLAINT

Humam Sarmad Saad Al-Saadi ("Al-Saadi"), an Iraqi citizen, and his Iraqi

company Celebrities Center for General Trading Company, Limited ("Celebrities

Center") (together, "Plaintiffs"), by their undersigned attorneys, bring this action against

Florida companies AnnChery Fajas, USA, Inc., AnnChery USA, Inc. and Ann Chery

Beauty, Inc. (together, "Ann Chery" or "Defendants" or "Ann Chery Defendants")

(Plaintiffs and Defendants together, "the parties").

## NATURE OF ACTION

1.     Plaintiffs bring this action against the Ann Chery Defendants for breach of

contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent

misrepresentation, tortious interference with an advantageous business relationship,

1

unfair and deceptive trade practices, unjust enrichment, and breach of implied-in-fact contract.

2.      In 2016, Mr. Al-Saadi and Ann Chery entered into a business relationship to import and sell internationally renowned Ann Chery undergarments (the most popular of which are called *fajas* "wraps or girdles" in Spanish) and other apparel and beauty products (together "other related products") in Iraq.

3.      *Fajas* are shapewear for both women and men typically worn around the lower torso and hip area to provide shape and support and to improve physical appearance.

4.      Al-Saadi's e-marketplace business model — attuned to the unique circumstances of doing business in Iraq — included importing the Ann Chery *fajas* from Miami-based Ann Chery and then selling them directly to Iraqi consumers utilizing a Facebook advertising page.

5.      Al-Saadi established a Facebook page for Iraq's e-marketplace called the Ann Chery Center: *m.facebook.com/Ann.Chery.Center* ("Plaintiffs' Ann Chery Center Iraq Facebook Page"). Plaintiffs' Ann Chery Center Iraq Facebook Page was the exclusive means by which Al-Saadi sold the Ann Chery *fajas* and other related products.

6.      The Facebook e-business model developed by Al-Saadi for the Iraq market was extremely successful. By early 2019, he had sold over $5,700,000 ($5.7 million) worth of Ann Chery *fajas* and other related products to online customers in Iraq via Facebook. Through Al-Saadi's hard work and tireless efforts, Plaintiffs' Ann Chery Center Iraq Facebook Page amassed more than one million (1 million) followers.

7.      From the beginning of the parties' business relationship, Ann Chery knew that Al-Saadi wanted to be the exclusive distributor of Ann Chery products in Iraq. Armed with this knowledge, Ann Chery representatives repeatedly urged Al-Saadi to make ever-larger orders, representing to Al-Saadi that such orders would lead the Ann Chery Board of Directors to approve an exclusive distributorship.  In October 2017, after Al-Saadi responded to Ann Chery's inducements by placing several additional large

orders, Ann Chery and Al-Saadi reached an agreement that Al-Saadi would be Ann Chery's exclusive distributor in Iraq.

8.      With this understanding, Al-Saadi made additional and larger orders of Ann Chery products in 2017, 2018, and 2019.

9.      Ann Chery breached the parties' agreement by, *inter alia*, selling to other distributors who sold in the Iraq market, and then effectively shutting down Al-Saadi's business in 2019, as if he was not and could not have been their exclusive distributor.

10.      In 2017 and 2018, Al-Saadi informed Ann Chery that counterfeiters and unauthorized distributors were undercutting his business in Iraq, including advertising on social media. Ann Chery agreed to take effective action to shut down the illicit sales, and requested and received from Al-Saadi information about the offending social media sites.

11.      Defendants also asked Al-Saadi for his e-marketplace Facebook page link so they could "protect" it. Al-Saadi provided the Facebook page link and Ann Chery assured Al-Saadi that his site was "safe."

12.      Nevertheless, in March 2019, Ann Chery caused false representations to be made to Facebook that Plaintiffs were not authorized to use the Ann Chery brand name and trademark on Plaintiffs' Ann Chery Center Iraq Facebook Page, resulting in the shutdown of Plaintiffs' e-marketplace. This action not only disregarded the parties' exclusive distributorship agreement and Ann Chery's approval and purported protection of Plaintiffs' Ann Chery Center Facebook Page, but also ignored the fact that Ann Chery did not hold any registered trademark in Iraq.

13.      Prior to selling any products to Al-Saadi in 2016, Ann Chery required that Al-Saadi execute an "Ann Chery Minimum Advertised Pricing Policy/Agreement" ("MAPP Agreement")," dealing with pricing and use of Ann Chery trademarks and advertising materials. Even though Plaintiffs fully complied with the MAPP Agreement, Ann Chery falsely claimed Plaintiffs were not entitled to the rights of an exclusive distributor to use the brand name, stating it has exclusive distributorship agreements in place in only very few countries, and then asserted a contrived breach of the MAPP

Agreement as a pretext for having shut down Plaintiffs' Ann Chery Center Iraq Facebook Page.

14.     Since all of Plaintiffs' sales were initiated online through Plaintiffs Ann Chery Center Iraq Facebook Page, Defendants' actions destroyed Plaintiffs' business.

## PARTIES

15.     Plaintiff Al-Saadi is, and at all times mentioned herein was, an Iraqi citizen, resident, and entrepreneur.

16.     Plaintiff Celebrities Center is, and at all times mentioned herein was, an Iraqi company, wholly owned by Al-Saadi. Al-Saadi established Celebrities Center in late 2018 and used it to continue bringing Ann Chery products to the Iraqi market through Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page.

17.     Defendant AnnChery Fajas USA, Inc. is, and at all times mentioned herein was, incorporated in Florida, with its principal place of business in Miami-Dade County.

18.     Defendant AnnChery USA, Inc. is, and at all times mentioned herein was, incorporated in Florida, with its principal place of business in Miami-Dade County.

19.     Defendant Ann Chery Beauty, Inc. is, and at all times mentioned herein was, incorporated in Florida, with its principal place of business in Miami-Dade County.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) based on the diversity of citizenship between Plaintiffs, who are citizens of Iraq, and Defendants, who are citizens of the State of Florida.

21.     The amount in controversy, without interest and costs, exceeds $75,000.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, as all three named Defendants are based in Miami-Dade County and interacted with Plaintiffs using a Miami business address.

## STATEMENT OF FACTS

**A.    Defendants Are an Integral Component of the Global Distribution of Ann Chery Branded Products**

23.    The Ann Chery brand is a world-renowned brand of shapeware undergarments (the most popular of which are called *fajas* "wraps or girdles" in Spanish) and other related products. Fajas were initially popularized in Latin America, and have in the past decade become broadly popular and sold globally.

24.    The U.S. corporate distribution structure for Ann Chery branded products includes the three Defendants, Miami-based companies AnnChery Fajas USA, Inc., AnnChery USA, Inc. and Ann Chery Beauty, Inc. These companies and their officials interacted collectively and/or indistinguishably with Plaintiffs using WhatsApp and email addresses, invoices, and other documents labeled "Ann Chery." Therefore, Plaintiffs' Complaint refers to Defendants collectively as "Ann Chery."[1]

**B.    Al-Saadi Tailors Luxury Brand Internet *Fajas* Sales for the Iraqi Consumer Market**

25.    Al-Saadi is an established and well-respected entrepreneur based in Baghdad, Iraq, with many years of business experience. He is a part of the new class of young entrepreneurs in post-Saddam Iraq, tapping into global e-commerce concepts and seeking to bring the Iraqi market into the 21st century.

26.    In 2015, Al-Saadi saw an opportunity to create a market in Iraq for the sale of Ann Chery products. Al-Saadi envisioned entering the Iraq electronic marketplace ("e-marketplace"), where credit cards and use of digital currency is scarce, by utilizing the popular Facebook as a platform to sell Ann Chery branded products directly to Iraqi consumers on a large scale.

27.    Al-Saadi first tested a small-scale version of his vision by purchasing Ann Chery branded products from Amazon and selling them to Iraqi consumers through a

---

[1] When referring to the Ann Chery *brand*, Plaintiffs' Complaint uses the phrase "Ann Chery brand," in contrast to "Ann Chery" which refers to the Defendant entities.

Facebook page. The business model was a success and with this precedent Al-Saadi was now ready to scale his business model, increase Ann Chery brand recognition in Iraq, and multiply his profits.

**C.     The Parties Form a Profitable Business Relationship**

28.     On October 25, 2015, Al-Saadi went on the Ann Chery English language website and, using the provided "Contact Us" email address: *contacto@AnnChery.com.co*, wrote expressing his interest in selling Ann Chery products. Al-Saadi's initial correspondence stated that he wanted to be the Ann Chery brand's sole representative in Iraq.

29.     On March 24, 2016, Customer Service directed Al-Saadi to use the "Official Company" email address: *salesusa@annechery.com.co* and he was thereafter put in contact with one of Ann Chery's authorized agents in the Middle East, Dubai-based Claudio Zabaleta.

30.     As a condition of entering into a direct business relationship with Ann Chery, Al-Saadi was required to provide: (1) a copy of his passport; (2) a copy of an English translation of the registration for any company buying Ann Chery products (if any); (3) a new customer information form; and (4) a signed version of the Ann Chery Minimum Advertised Pricing Policy/Agreement ("MAPP Agreement.) The MAPP Agreement was printed on letterhead with the imprint "ANN CHERY" at the top, and the street address 11250 NW 25th Street, Miami, FL 33172, at the bottom. The MAPP Agreement required Al-Saadi to charge no more than 30% higher than Ann Chery's published list price and not less than 1 cent under the list price. It also provided that Al-Saadi would "hold all trademarks of Ann Chery as the property of Ann Chery and use advertising materials provided by Ann Chery in an authorized manner only." Al-Saadi signed the MAPP Agreement on April 17, 2016, and returned it to Ann Chery.

31.     Miami-based Ann Chery then shared their inventory and price lists with Al-Saadi so that he could place orders. Zabaleta also sent Al-Saadi wire transfer

instructions — for an "Ann Chery Showroom USA" Bank of America account — to initiate payment for orders and the shipping of products from Florida to Iraq.

32.     By May 2016, the "Ann Chery Global Sales Team" (as they called themselves in correspondence) agreed to send Al-Saadi his first shipment of Ann Chery products. Al-Saadi placed multiple orders from Ann Chery during the remainder of 2016, with Claudio Zabaleta facilitating the order and shipment procedures. In total, Plaintiffs imported approximately 11,000 pieces of merchandise from Ann Chery into Iraq in 2016.

33.     In early 2017, Al-Saadi's point of contact at Ann Chery was changed from Dubai-based Claudio Zabaleta to Miami-based Ann Chery senior manager Luis Becerra. Zabaleta introduced Becerra to Al-Saadi as his "boss" and "manager."

34.     Ann Chery issued Al-Saadi a "**Certificate of Authenticity**" dated March 31, 2017, which confirmed that Al-Saadi "purchases legitimate products from **ANN CHERY FAJAS USA INC** sole owner of the brand around the world." (emphasis in original.) *See* **Exhibit A** attached hereto.

35.     In October 2017, Al-Saadi was introduced to yet another individual at Ann Chery, Alberto de la Rosa, who described himself in written correspondence as "Ann Chery Vice President."

36.     Al-Saadi's relationship with Ann Chery continued through Becerra and de la Rosa, and by the end of 2017, Al-Saadi had ordered nearly 18,000 pieces of merchandise from Ann Chery for the year.

**D.     In Reasonable Reliance on Ann Chery's Representations and Inducements and the Parties' Agreement for the Exclusive Distributorship in Iraq, Al-Saadi Increases His Investment, Increases His Orders and Builds His Online Iraq Enterprise with the Ann Chery Brand in Iraq but Ann Chery Breaches the Agreement**

*Ann Chery's Inducement to Place Large Orders and the Agreement Establishing an*
*Exclusive Distributorship for Al-Saadi*

37.     On several occasions during the course of their business relationship, Becerra articulated the importance of the parties' relationship, assuring Al-Saadi that he was "our go to distributor in Iraq," that "we've made efforts … in order to have you and your company as our main distributor" and "[I] will specifically make sure to expedite the franchising process." (WhatsApp messages of April 11, 2017.)

38.      As Al-Saadi had made clear from the inception of his relationship with Ann Chery that he wanted to be the exclusive distributor of their products in Iraq, Ann Chery repeatedly represented in WhatsApp text messages to Al-Saadi that large orders would create goodwill with the board of directors in order to make him the exclusive distributor in Iraq. At no time prior to shutting Plaintiffs down did Ann Chery disclose that it had a general policy not to have exclusive distributors, with exclusive distribution agreements in place in only very few countries.

39.     To the contrary, Ann Chery's correspondence made clear that not only was such an arrangement possible, but they were also working to make that happen, and larger orders would be viewed favorably by the Board of Directors in making Al-Saadi their exclusive distributor in Iraq. Ann Chery's inducements culminated in an agreement with Al-Saadi to make him their exclusive distributor in Iraq.  In June 2017, Becerra, as had been common, represented to Al-Saadi that placing a large order would assist with the board of directors deciding on his exclusive distributorship. Becerra wrote to Al-Saadi:

> [W]e would like to work alongside with [sic] you in order to grant the exclusive distribution of our products in your country…however until we reach that point we need to follow procedures…as I've mentioned before after we got approval of your special price list my Board of Directors are putting a lot of pressure expecting a large order from your company. I am meeting again with the Board next Tuesday and your case will be raised…I have been fighting and working to

make this happen but the lack of a new extensive order weakens my case in front

of my Board.

(WhatsApp message of June 17, 2017.) Al-Saadi responded immediately by indicating

that he was planning to make a new order for the purpose of meeting the Board's

inducements, while also insisting on the need for Ann Chery to terminate sales to U.S.

distributors who were purchasing Ann Chery products in the U.S. and reselling them into

the Iraq market:

> Though we are planning to make order that could justify granting us exclusive
>
> merchandise rights to your priducts (sic), we feel at the present time that we are in
>
> the short term not in a position to expand due to the intruders that are trying to
>
> damage our business.  However, you can still depend on our previous big orders
>
> to present a good case wuth (sic) the board of directors.  To reassure you we are
>
> still the strongest.

(WhatApp Message of June 17, 2017.)

40.     Ten days later, Becerra intensified pressure for Al-Saadi to place new

orders. In two successive WhatsApp messages Becerra specifically emphasized their

connection to the exclusive distributorship when he wrote to Al-Saadi "[I] would like to

check with you in regards to your business and upcoming orders…your account has been

very inactive for the past months" (WhatsApp message of June 28, 2017) and "[a]ny

order no matter the size is always decent for us…the effort we ask is due to the fact that

you will l[i]ke to be exclusive distributor." (*Id.,* June 29, 2017.)

41.     In response, Al-Saadi informed Becerra on July 5, 2017, that he intended

to place five new orders.

42.     On July 8, 2017, Becerra wrote back to Al-Saadi, again dangling the

exclusive distributorship in return for placing large orders:

> We would love to give you the special price and we have been waiting for you to
>
> place new orders so we can not only justify the special pricing but also to
>
> reinforce your case in front of the Board in order to finally discuss the terms and

> conditions of an exclusive distribution. I am pleased to hear from you that you
> will place a large order to support and cause substantial effect with presenting
> your case to [sic] final approval.

(WhatsApp message of July 8, 2017.)

43.     The next day, Al-Saadi advised Becerra that "the five orders are about to
be sent now at any time today." He also cited the importance of stopping sales to U.S.
vendors who were exploiting the market for Ann Chery products he had created in Iraq
by likewise selling Ann Chery products bound for Iraq:

> As a matter of fact we are concerned about some important point connected with
> granting us exclusive rights to sell Ann Chery products in Iraq. . . . U.S.
> companies are purchasing your products from you and resold them to Iraqi
> distributors in Iraq on the distributor's own demand. The important question here:
> Are you going to be able to stop these sales to those US companies whose
> purchases are Iraq market bound, in case we are granted exclusive rights to Ann
> Chery for Iraq. We have the names of these companies and we can provide them
> to you if this helps. We require specific reply to this question please.

(WhatsApp message of July 9, 2017.)

44.     Al-Saadi placed the five large orders on July 9, which were documented in
invoices dated July 14. Al-Saadi confirmed to Becerra on July 27, 2017 that "[b]asically
we made this bigger order in order to support our case before the Board of Directors."
(WhatsApp message of July 27, 2017.) Soon thereafter, Becerra informed Al-Saadi that
Ann Chery Vice President Alberto De la Rosa would contact him, which occurred on
October 17, 2017. De la Rosa informed Al-Saadi that his account had been reviewed and
based on his prior orders, Ann Chery was agreeing to make him their  exclusive
distributor, and would meet Al-Saadi's demand that Ann Chery stop other distributors
from selling their products in Iraq. On October 17, 2017, in a WhatsApp message, de la
Rosa wrote:

First, [I] want to thank you for being such a good customer and carry [sic] our Brand as your own in your country[.] After careful review of your account, past orders and fantastic projections for your region, we woukd [sic] like to offer to your business new incentives in your next orders, that will have your business to be the biggest and most important partner we will have in the middle East region[.] . . . **We are aware about the situation with the distributor in the USA that is sending Ann Chery to your country without permission. We are enforcing sanctions here that will bring peace of mind to you and your business.  We want to have you have the only ANN Chery distributor in Iraq[.]  We will issue a certificate where states [sic] your business as exclusive distributor[.] . . . You will have no competitors able to sell the goods at your price point[.]**

(WhatsApp messages of October 17, 2017. (emphasis added).)

45.     Al-Saadi agreed, responding the same day: "This is a great development . . . This is a quantum improvements that would certainly benefit both sides of us.  We pray that there would be no impediments in our path for benefiting from this package of facilities." (*Id.*)

46.     With this exclusive distributorship agreement now in place and Ann Chery representing that "[w]e are enforcing sanctions" against "distributor in the USA that is sending Ann Chery to your country," Al-Saadi placed additional, larger orders for Ann Chery merchandise in the ensuing months.

47.     In August 2018, Ann Chery confirmed Al-Saadi's exclusive status, to which Ann Chery agreed in October 2017, after Al-Saadi complained that Iraqi importers from the United States, with Ann Chery certificates, were still bringing Ann Chery products to the Iraq market and doing so under the name "Ann Chery Iraq." De la Rosa assured Al-Saadi: "Don't worry about Ann Chery Iraq on facebook . . . We are dealing with them legally." (WhatsApp message of August 20, 2018.) Al-Saadi then informed de la Rosa about another dealer using the name "Ann Chery Iraq" who also had an Ann

Chery certificate. De la Rosa replied: **"Those are fake certificates also. . . We can assure those are fake certificates . . . No certificate were issued to any Iraq distributer . . . as matter of fact our one and only distributor in Iraq is your company."** (*Id.*) (Emphasis added.)

48.     Nevertheless, Al-Saadi later learned that, in contravention of their agreement, Ann Chery indeed sold to other distributors who were selling to the Iraq market. This undercut Al-Saadi's business as exclusive distributor in the Iraqi market that he had built from the ground up.

*Al-Saadi's Pioneering E-Marketplace Business Model in Iraq and Scaling Up to Increase Orders and Sales*

49.     Much of the initial success of Al-Saadi's business can be attributed to his acumen in realizing that the future of commerce in Iraq was the sale of consumer products to online customers via Facebook.

50.     Iraq presents a series of unique circumstances for online consumer businesses. Iraq is still an almost entirely cash-based economy, with very few consumers having debit cards. Credit cards are even rarer. However, ownership of smartphones connected to the Internet is nearly ubiquitous. Internet speed is often slow and electricity sometimes unreliable, making the ability to load many websites time-consuming. All of these realities make traditional e-commerce as understood in the West — where the consumer goes to a website, finds the product he/she wants, makes the purchase online using a debit or credit card, and receives the item by mail — difficult. Instead, in Iraq Facebook offers a simpler and more accessible web platform than many freestanding company websites, particularly on mobile devices. As a result, Facebook pages have become a main e-marketplace for Iraqis to do their online shopping.

51.     Al-Saadi never established a brick and mortar store to sell Ann Chery products. Instead, from his office in Iraq, he created an e-marketplace, Plaintiffs' Ann Chery Center Iraq Facebook Page (*m.facebook.com/Ann.Chery.Center*). Using this page, Al-Saadi developed a hybrid system where product inventory is viewed online by Iraqi

consumers, orders are placed by phone or instant message, and payment is made by cash upon delivery to the consumer of the Ann Chery items purchased.

52.     Al-Saadi was one of the first Iraqi businessmen to introduce Facebook shopping in Iraq at the end of 2015. He did so at a time when Iraq was suffering from a difficult economic situation due to the war against terrorism, and when many regions, provinces, and some cities were outside the control of the Iraqi army. Moreover, at that time, the corset (*fajas*) market was non-existent in Iraq.

53.      To make the business even more successful, Al-Saadi invested heavily in creating a professional advertising and sales platform on Facebook. This included hiring female models in the United States to wear the *fajas* in campaign ads for his Facebook page. Altogether, between 2016 and 2019, Al-Saadi spent more than $200,000 creating, marketing and continually improving the e-marketplace Ann Chery Center Iraq Facebook page, in addition to increasing purchase orders. And, by the end of 2018, Al-Saadi more than doubled the previous years' orders with nearly 40,000 pieces of Ann Chery merchandise.

54.     In November 2018, in order to comply with new corporate regulations in Iraq, Al-Saadi formed an Iraqi company, Plaintiff Celebrities Center, to help facilitate the continued success of his Ann Chery e-marketplace business in Iraq.

55.     In March 2019, when Ann Chery caused Facebook to shut down Plaintiffs' Ann Chery Center Iraq Facebook Page, the page had more than one million (1 million) followers.

**E.     Counterfeit Ann Chery Products Saturate the Iraq Market; Ann Chery Promises to Stamp Out This Fake Competition**

56.     In early 2017, cheap counterfeit Ann Chery branded products were being advertised on social media and saturating the Iraq market, making it difficult for Al-Saadi to sell genuine products at market prices. Al-Saadi immediately informed Becerra that the counterfeiters were causing problems and requested that Ann Chery shut them down.

57.     In April 2018, de la Rosa and Becerra advised Al-Saadi that Ann Chery
was working hard to shut down the unauthorized advertising of their products, including
advertising on social media. In a WhatsApp text of April 24, 2018, de la Rosa requested
Al-Saadi to provide Ann Chery with the "social media accounts you guys currently use"
so that they "will not be in [sic] the radar…And to not be shutted [sic] down…" In
reliance on their assertions that providing such information would secure Plaintiffs' Ann
Chery Center Iraq Facebook Page, Al-Saadi promptly provided the Facebook page link to
them. (WhatsApp message of April 25, 2018.)

58.     At the same time Al-Saadi provided his Ann Cherry Center Facebook
Page link to de la Rosa and Becerra in April 2018, he also assisted Ann Chery's anti-
counterfeiting campaign by providing Ann Chery with a list of at least a dozen other Iraq-
based Facebook page links where fake Ann Chery products were being sold and also
where unauthorized dealers were selling Ann Chery original products, which once again
served to undercut Al-Saadi's legitimate, Ann Chery-sanctioned business. (WhatsApp
messages of April 25, 2018.)

59.     De la Rosa and Becerra even praised Al-Saadi's efforts to help combat the
illicit sale of Ann Chery products in the Iraq region, including, for example, Becerra's
statement: "Thank God we were able to combine our efforts with your cooperation to
improve the conditions of your business..." (WhatsApp message of August 22, 2018.)

60.     In October 2018, after repeating that the purpose of obtaining Al-Saadi's
official media accounts was "so we can shield them from any legal action," de la Rosa
wrote and explicitly confirmed to Al-Saadi that "**Yes ... we have the facebook user you
provide us and it is safe**." (WhatsApp messages of October 24, 2018) (emphasis added).
With this last message, de la Rosa included a screenshot of Plaintiffs' Ann Chery Center
Iraq Facebook Page that was **"safe."** *See* **Exhibit B,** attached hereto.

61.     In its correspondence, Ann Chery acknowledged the "urgent" need to shut
down the counterfeiters. Ann Chery even asked Al-Saadi (in February 2019) to purchase
products and obtain receipts from brick and mortar stores selling such counterfeit "Ann

Chery brand" products in Baghdad. Al-Saadi assented to Ann Chery's "urgent" need and purchased the requested counterfeit products, procured a receipt and waited for Ann Chery to provide an address to send the fake products. (WhatsApp messages of February 25, 2019 and March 5, 2019.) In the end, however, Ann Chery did not even inform Al-Saadi where to send the fake products (that he had obtained at great risk due to serious criminal elements involved in counterfeiting in Iraq). Nor did Ann Chery prosecute the major counterfeiter they claimed they were targeting for elimination. Notwithstanding the parties' understanding that Ann Chery would make effective efforts to eliminate counterfeiters in the market that were harming Plaintiffs, Ann Chery failed to do so.

**F.      Ann Chery Suddenly and Without Warning Wrongfully Causes the Shut Down of Plaintiffs' Facebook Business**

62.     Throughout 2018, Ann Chery continued to encourage Al-Saadi to increase his orders, and continued to fulfill large orders from Al-Saadi for his customers. Further, de la Rosa and Becerra continued in various communications to express a particular interest in Al-Saadi's successful business model — seeking to extract specifics as to how he amassed more than  one million (1 million) followers on his Facebook page in just a few short years.

63.     On March 9, 2019, without any notice or recourse, Al-Saadi discovered that his Facebook e-marketplace page had suddenly been shut down. This was almost five months after Ann Chery confirmed Plaintiffs' site was "**safe**" from legal action and after Ann Chery fulfilled an additional $384,636 in merchandise orders by Plaintiffs.[2]

64.      Al-Saadi immediately informed  Becerra and de la Rosa. To his shock and surprise, they confirmed that they were aware of the shutdown.

65.     To add insult to injury, Al-Saadi discovered that many of the Facebook pages he had flagged for Ann Chery as selling counterfeit or unauthorized original

---

[2]   Based on Plaintiffs' past sales, those orders would have resulted in $2 million-to-$2.38 million in retail sales to Plaintiffs.

products remained active on Facebook, while Plaintiffs' "safe" page selling legitimate products was shut down.

66.     De la Rosa and Becerra replied with a series of WhatsApp messages with confusing rationales for the shutdown. They stated, for example, that Facebook closed Plaintiffs' Ann Chery Center Iraq Facebook Page due to Plaintiffs' "unauthorized use of [their] brand name and trademarks:"

> We have contacted our legal team and they have just confirmed that according to Facebook's policies they can't discriminate between users and delete some accounts for unauthorized use of our brand name and trademarks, that will be considered by Facebook discriminatory and restrictive of the free market... our legal team efforts are fully supported by Facebook on the condition that only the owner of the brand (our company in Colombia) can use the brand name… the only exception is when we (as owners of the legal rights of the brand) have an exclusive distribution agreement in place, which we only have in very few countries….
>
> …[F]acebook is acting by their own policies, after our legal team submitted the request to remove any use of our brand name and trademark … [a]ccording to the MAPP agreement signed by all of our customers at the moment of the registration….
>
> The guidelines were set from the beginning in our MAPP agreement with every legitimate reseller! We are not in the position of axing our resellers specially [sic] when is in our best interest to keep the conditions of fair business. . .

(WhatsApp messages from March 9, 2019.)

67.     Ann Chery's explanation suggesting Al-Saadi was not an exclusive distributor contradicted not only Ann Chery's previous agreement that Al-Saadi was their

exclusive distributor, but also their previous approval of Plaintiffs' Ann Chery Center Iraq Facebook Page and assurance that it would be protected and was "safe."

68.     On March 14, 2019, Ann Chery sent Al-Saadi another bogus justification for the shutdown:

> [A]fter carefully reviewing every single case with our legal team . . . the reason of your suspension was the flagrant violation of the provisions of the MAPP agreement duly signed by you, specifically provisions 8, 9 and 10 . . . [addressing unauthorized use of Ann Chery trademark, failure to abide by MAPP Agreement, and degradation of the Ann Chery image.]

69.     This second shutdown rationale was obviously contrived. First, per the MAPP Agreement, Al-Saadi used the Ann Chery name and marks in an authorized manner. Indeed, he specifically disclosed Plaintiffs' Ann Chery Center Iraq Facebook Page link to Ann Chery officials de la Rosa and Becerra at their request in April 2018 for the purported purposes of protecting it, and in late 2018 they *confirmed* that they had looked at it and it was "**safe**." It is simply beyond dispute that Ann Chery authorized Plaintiffs' use of the "Ann Chery" name on their Facebook page.

70.     Further, contrary to Ann Chery's assertions, Ann Chery knew they did not hold any trademarks in Iraq. Neither Ann Chery, nor any affiliated entity, had registered the Ann Chery name or any of their marks with the trademark office in Iraq.

71.     In sum, Ann Chery knew or should have known there was no basis for closing Plaintiffs' Facebook page. The devastating result of these actions for Plaintiffs was that by improperly and intentionally causing Facebook to shut down Plaintiffs' Ann Chery Center Iraq Facebook Page, Ann Chery put Plaintiffs' multi-million dollar going concern in Iraq out of business.

**G.     Plaintiffs' Attempts to Salvage the Business Relationship Fail**

72.     Facebook's notice to Al-Saadi following the takedown of Plaintiffs' Ann Chery Center Iraq Facebook Page advised him to contact the "complaining party" to resolve the issue: "If you believe that this content should not have been removed from

Facebook, you can contact the complaining party directly to resolve your issue: …Rights Owner: CI Manufacturas Model International SAS …" Based on Al-Saadi's extensive dealings with Ann Chery officers, offices, and products, and the lack of any prior involvement of the named entity, Al-Saadi's recourse was to try to resolve the situation with the Ann Chery representatives with whom he had dealt.[3]

73.     When de la Rosa and Becerra would not assist Al-Saadi with restoration of his e-marketplace Ann Chery Center Iraq Facebook Page, Al-Saadi contacted Ann Chery's top official in the United States, Angelica Riveros. Ms. Riveros is CEO of Defendant AnnChery Fajas USA, Inc. and President of Defendant Ann Chery Beauty, Inc. (whose email address, ar.anncheryusainc@gmail.com, includes the name of Defendant AnnChery USA, Inc.). Riveros responded: **"please be sure that we will fix this situation."** (June 8, 2019 email) (emphasis added).

74.     However, the situation was never fixed, resulting in millions of dollars in damages to Plaintiffs.

## **FIRST CLAIM**

### **Breach of Exclusive Distributorship Contract**

75.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1 through 74 as if fully set forth herein.

76.     Al-Saadi and Ann Chery entered into a valid and binding contract to make Al-Saadi Ann Chery's exclusive distributor in Iraq, as reflected in the October, 2017 correspondence and confirmed in the August, 2018 correspondence between the parties quoted in paragraphs 44 – 47 above and incorporated herein.

---

[3]   As noted, Ann Chery confirmed to Plaintiffs that they provided Plaintiffs' Ann Chery Center Iraq Facebook Page link and details to Facebook and caused the shutdown of Plaintiffs' site. Despite references to an entity called "CI Manufacturers Model International SAS" as the "rights owner," Ann Chery had provided Al-Saadi with a certificate stating that Defendant AnnChery Fajas USA, Inc. is the "sole owner of the brand around the world." Exhibit A. Nevertheless, the fact remains that *no Ann Chery entity or affiliate ever owned or registered any trademark* or other legal protection of the name in Iraq.

77.    From the beginning of the parties' relationship Ann Chery knew that Al-Saadi wanted to become Ann Chery's exclusive distributor in Iraq. On repeated occasions, Ann Chery suggested that Al-Saadi's making large orders would lead to Ann Chery granting him the exclusive distributorship. Al-Saadi responded by substantially increasing his orders of Ann Chery products.

78.    On October 17, 2017, De la Rosa informed Al-Saadi that his account had been reviewed and based on his prior orders, Ann Chery was agreeing to make him their exclusive distributor, including meeting  Al-Saadi's demand that Ann Chery stop other distributors from selling their products in Iraq. De la Rosa wrote: "We want to have you as the only ANN [sic] Chery distributor in Iraq. We will issue a certificate where states your business as exclusive distributor . . . You will have no competitors able to sell the goods at your price point." (WhatsApp messages of October 17, 2017.)

79.    Al-Saadi immediately agreed, responding: "This is a great development. This is a quantum improvements that would certainly benefit both sides of us. We pray that there would be no impediments in our path for benefiting from this package of facilities." (*Id.*)  With this agreement, Al-Saadi placed larger additional orders for Ann Chery merchandise.

80.    De la Rosa confirmed to Al-Saadi in August 2018: "as matter of fact our one and only distributor in Iraq is your company."

81.    Ann Chery breached the exclusive distributorship agreement by continuing to sell Ann Chery products to distributors who sold in the Iraq market, and by wrongfully causing Plaintiffs' sole sales mechanism, Plaintiffs' Ann Chery Center Iraq Facebook Page, to be shut down, as if Plaintiffs were not an exclusive distributor with authority to use the Ann Chery brand name.

82.    As a direct and proximate result of Ann Chery's breach of the parties' exclusive distributorship agreement, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages arising from the breach of the exclusive distributorship agreement; costs; interest; and such other relief as this Court deems just, equitable and proper.

## SECOND CLAIM

### Breach of the Implied Covenant of Good Faith and Fair Dealing

83.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, and 76- 82 as if fully set forth herein.

84.     Florida law recognizes an implied covenant of good faith and fair dealing in every contract, which requires the parties to act honestly in the conduct of their contractual relations and protects the parties' reasonable expectations.

85.     Ann Chery breached the covenant of good faith and fair dealing in connection with the parties' exclusive distributorship agreement and the MAPP Agreement.

86.     In particular, Ann Chery caused the shutdown of Plaintiffs' e-marketplace Center Iraq Facebook Page on the contrived bases that Plaintiffs were not authorized to use the Ann Chery brand name as would be allowed if an exclusive distributorship agreement were in place, and that Plaintiffs had violated Paragraphs 8, 9 and 10 of the MAPP Agreement.

87.     Paragraph 8 of  the MAPP Agreement provides that the "Dealer agrees to hold all trademarks of Ann Chery as the property of Ann Chery and use advertising materials in an authorized manner only." (MAPP, ¶ 8.) Paragraph 9 provides that "intentional or repeated failure to abide by this [the MAPP] policy will result in termination of dealership or sales representatives. ACI [Ann Chery, Inc.] does not intend to do business with dealers or sales representatives who degrade the image of ACI and its products . . ."). (*Id.*, ¶ 9.) Paragraph 10 provides that "ACI reserves the right to cancel any pending orders, restrict future orders, or suspend dealers' account if ACI reasonably

believes: (i) a dealer has violated the provisions of this policy or (ii) a dealer intends to violate this policy." (*Id.*, ¶ 10.)

88.      Not only did Plaintiffs have an exclusive distributorship agreement in place, but Plaintiffs complied with these and all other provisions of the MAPP Agreement. Plaintiffs did not hold Ann Chery products or trademarks as their own, and did not use Ann Chery advertising materials in an unauthorized manner. To the contrary, Al-Saadi was transparent during his business relationship with Ann Chery, providing more than once the link information for Plaintiffs' Ann Chery Center Iraq Facebook Page that contained his own professionalized advertising content prepared to facilitate the sale of Ann Chery products through this online platform. After reviewing Plaintiffs' e-marketplace platform, Ann Chery Vice President de la Rosa confirmed to Al-Saadi that "Yes… we have the facebook user you provide us and it is safe" and included a screenshot of Plaintiffs' Ann Chery Center Iraq Facebook Page. (*See* Exhibit B.) Ann Chery also fulfilled substantial new orders from Plaintiffs after reviewing Plaintiffs' Ann Chery Center Iraq Facebook Page and declaring it to be "safe."

89.      In addition, as Plaintiffs later learned, Ann Chery does not even own the Ann Chery name or trademarks in Iraq, yet purported to terminate Plaintiffs' rights under the MAPP based on alleged trademark violations.

90.      Simply put, Plaintiffs' activities were authorized by Ann Chery and Ann Chery's action causing termination of Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page (and destruction of Plaintiffs' profitable business) on these false and pretextual bases frustrated Plaintiffs' reasonable expectations that Ann Chery would act honestly in the conduct of the parties' contractual relations, and constitutes a breach of the implied covenant of good faith and fair dealing.

91.      As a direct and proximate result of Ann Chery's breach of the implied obligation of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages; costs; interest; and such other relief as this Court deems just and proper.

### THIRD CLAIM

**Fraud**

92.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, and  84- 91 as if fully set forth herein.

93.     Beginning in 2016, and continuing thereafter, Ann Chery knowingly made material misrepresentations, and omitted to disclose material information in their communications with Al-Saadi, to induce Al-Saadi to invest heavily in his e-marketplace Facebook page, build a market in Iraq for Ann Chery shapewear and beauty products, and increase his orders of Ann Chery products. Al-Saadi justifiably relied on Ann Chery's material misrepresentations and omissions, resulting in substantial damages to Plaintiffs.

94.     Since his first correspondence to Ann Chery, Al-Saadi expressed his desire to be the company's "sole representative" in Iraq. Knowing this, Ann Chery senior official Becerra, on April 11, 2017, assured Al-Saadi "you are our go to distributor in Iraq," that "we've made efforts . . . in order to have you and your company as our main distributor" and "[I] will specifically make sure to expedite the franchising process." (WhatsApp messages of April 11, 2017.) Moreover, Ann Chery also repeatedly represented to Al-Saadi that his placing additional large orders would support his becoming the exclusive distributor in Iraq.

95.     On June 17, 2017, Becerra represented to Al-Saadi that placing a large order would assist with the board of directors approving his exclusive distributorship. On June 28 and 29, Becerra intensified the pressure to place new orders to secure the exclusive distributorship when he wrote  to Al-Saadi "[I] would like to check with you in regards to your business and upcoming orders…your account has been very inactive for the past months" because "[a]ny order no matter the size is always decent for us…**the**

**effort we ask is due to the fact that you will l[i]ke to be exclusive distributor**.*"* (emphasis added.)

96.     Induced  by Becerra's representations that placement of large orders would help with approval of the exclusive distributorship, on July 5, 2017 Al-Saadi informed Becerra that he intended to place five new orders.

97.     On July 8, 2017, Becerra wrote back to Al-Saadi: "We would love to give you the special price and we have been waiting for you to place new orders so we can not only justify the special pricing but also to reinforce your case in front of the Board in order to finally discuss the terms and conditions of an exclusive distribution. I am pleased to hear from you that you will place a large order to support and cause substantial effect with presenting your case to [sic] final approval." (WhatsApp message of July 8, 2017.)

98.     On July 9, 2017, Al-Saadi advised Ann Chery that "the five orders are about to be sent now at any time today." He added that it would also be necessary for Ann Chery to stop U.S. vendors who were exploiting the market for Ann Chery products he had created in Iraq:

> As a matter of fact we are concerned about some important point connected with granting us exclusive rights to sell Ann Chery products in Iraq. . . . U.S. companies are purchasing your products from you and resold them to Iraqi distributors in Iraq on the distributor's own demand. The important question here: Are you going to be able to stop these sales to those US companies whose purchases are Iraq market bound, in case we are granted exclusive rights to Ann Chery for Iraq. We have the names of these companies and we can provide them to you if this helps. We require specific reply to this question please.

(WhatsApp messages of July 9, 2017.)

99.     Al-Saadi placed the five large orders on July 9, which were documented in invoices dated July 14. Al-Saadi confirmed to Becerra on July 27, 2017 that "[b]asically we made this bigger order in order to support our case before the Board of Directors." (*Id.,* July 27, 2017.)

100.    Soon thereafter, Becerra informed Al-Saadi that Ann Chery Vice President Alberto De la Rosa would contact him, which occurred on October 17, 2017. De la Rosa informed Al-Saadi that his account had been reviewed and based on his prior orders, Ann Chery was making him an exclusive distributor, including meeting Al-Saadi's demand that Ann Chery stop other distributors from selling their products in Iraq. On October 17, 2017, in a WhatsApp message, de la Rosa wrote:

> First, [I] want to thank you for being such a good customer and carry [sic] our Brand as your own in your country[.] After careful review of your account, past orders and fantastic projections for your region, we woukd [sic] like to offer to your business new incentives in your next orders, that will have your business to be the biggest and most important partner we will have in the middle East region[.] . . .We are aware about the situation with the distributor in the USA that is sending Ann Chery to your country without permission. We are enforcing sanctions here that will bring peace of mind to you and your business.  We want to have you have the only ANN Chery distributor in Iraq[.]  We will issue a certificate where states [sic] your business as exclusive distributor[.] . . . You will have no competitors able to sell the goods at your price point[.]

(WhatsApp messages of October 17, 2017.)

101.    Al-Saadi immediately accepted Ann Chery's proposal, and with this understanding placed additional large orders for Ann Chery products in the ensuing months.

102.    In August, 2018, after Al-Saadi complained about other importers of Ann Chery products selling in the Iraqi marketplace, Ann Chery confirmed Al-Saadi's exclusive status, and Al-Saadi continued to make Ann Chery purchases.

103.    Ann Chery made these representations with respect to Al-Saadi's becoming (and being) their exclusive distributor with knowledge that they were false when made or with reckless disregard for whether they were true. Indeed, unbeknownst to Al-Saadi and undisclosed by Ann Chery was the material fact that Ann Chery

apparently had a general policy not to have exclusive distributors, except in only very few countries, and, notwithstanding Ann Chery's representations and agreement, Ann Chery had no intention to treat Al-Saadi as their exclusive distributor, as they subsequently demonstrated.

104.   Ann Chery intended for Al-Saadi to rely on their representations that he would and had become Ann Chery's exclusive distributor in Iraq and their omission to disclose a general policy not to give such exclusive status except in only very few countries, and Al-Saadi did rely on these representations and omissions to his detriment in investing heavily in his Iraq-based e-marketplace business and making increased purchase orders.

105.   Despite their representations of exclusivity for Al-Saadi, Ann Chery allowed other distributors in Iraq to sell Ann Chery products, which undercut and harmed Al-Saadi's business.

106.   In addition, in April 2018, ostensibly in an effort to quell Al-Saadi's fears and frustration over ever-dominant Ann Chery counterfeiters encroaching on the Ann Chery Iraq market, Ann Chery informed Al-Saadi that it was working hard to shut down unauthorized advertising of Ann Chery products on social media and sales of counterfeit Ann Chery products as well. Ann Chery asked Al-Saadi to provide his social media accounts so they would be secured. Al-Saadi shared Plaintiffs' Ann Chery Center Iraq Facebook Page link with Ann Chery officials de la Rosa and Becerra in April 2018.

107.   In October 2018, after Ann Chery officials asked Plaintiffs again for their Facebook e-marketplace link and Al-Saadi reminded them that he had sent it to them back in April, Ann Chery reassured Al-Saadi that providing the page link to Ann Chery: "shield[ed] [his social media accounts] from any legal action" and was the reason "why the [Facebook] account has never been targeted by any of our legal battles," and that Plaintiffs' Ann Chery Center Iraq Facebook Page was "safe." After this exchange, Plaintiffs made additional purchases of Ann Chery products which Plaintiffs have been

unable to sell since Ann Chery caused Plaintiffs' e-marketplace Facebook page to be shut down.

108.    Ann Chery intended for Plaintiffs to rely on these representations and Plaintiffs did rely on Ann Chery's representations in providing the Facebook page link and making additional purchases.

109.    Yet, in March 2019, after nearly three years of an exceptionally profitable business relationship, without any notice or recourse, Al-Saadi learned that Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook page had been abruptly shut down by Facebook based upon information provided by Ann Chery.

110.    Al-Saadi confronted his U.S.-based Ann Chery business contacts, de la Rosa and Becerra. On March 9, 2019 he received WhatsApp messages from de la Rosa and Becerra stating in relevant part:

> We have contacted our legal team and they have just confirmed that according to Facebook's policies they can't discriminate between users and delete some accounts for unauthorized use of our brand name and trademarks, that will be considered by Facebook discriminatory and restrictive of the free market . . . [o]ur legal team efforts are fully supported by Facebook on the condition that only the owner of the brand (our company in Colombia) can use the brand name….the only exception is when we (as owners of the legal rights of the brand) have an exclusive distribution agreement in place, which we only have in very few countries….
>
> …[F]acebook is acting by their own policies, after our legal team submitted the request to remove any use of our brand name and trademark . . . [a]ccording to the MAPP agreement signed by all of our customers at the moment of the registration....

> The guidelines were set from the beginning in our MAPP agreement with every
> legitimate reseller! We are not in the position of axing our resellers specially
> [sic] when is in our best interest to keep the conditions of fair business...

And then finally, on March 14, 2019, de la Rosa offered more specific "reasons" for the account shutdown:

> [A]fter carefully reviewing every single case with our legal team… the reason of
> your suspension was the flagrant violation of the provisions of the MAPP
> agreement duly signed by you, specifically provisions 8, 9 and 10-…

111.    Thus, contrary to Ann Chery's prior representations, Plaintiffs learned after the shutdown not only that Ann Chery apparently had an undisclosed general policy not to have exclusive distributors except in only very few countries, but also that Ann Chery was treating Plaintiffs as if they were not an exclusive distributor in claiming unauthorized use of the brand name as a basis to shut down Plaintiffs' e-marketplace Facebook page. Indeed, Ann Chery's representations that by providing Plaintiffs' Facebook link Al-Saadi would and did secure Plaintiffs' Ann Chery Center Iraq Facebook Page were also false as Ann Chery used that information to cause Plaintiffs' e-marketplace to be shut down.

112.    As a direct and proximate result of Ann Chery's misrepresentations alleged herein, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages; costs; interest; and such other relief as this Court deems just and proper.

## FOURTH CLAIM

### Negligent Misrepresentation

113.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, 84-91, and 93-112as if fully set forth herein.

114.    If Ann Chery did not intentionally make the misrepresentations and omissions alleged in paragraphs 93 - 111 above, they acted negligently when supplying

false information and omitting material facts to Al-Saadi and Celebrities Center during the parties' business relationship.

115.    Ann Chery made the representations that Al-Saadi's increasing orders would lead to an exclusive distributorship, that Al-Saadi was in fact an exclusive distributor, and that Ann Chery would protect Plaintiffs' Ann Chery Center Iraq Facebook Page if Plaintiffs provided the link, with no reasonable grounds to believe they were true.

116.    Plaintiffs, at the time the aforementioned misrepresentations and omissions were made by Ann Chery, were not aware of their falsity and believed them to be true.

117.    Plaintiffs justifiably relied on these misrepresentations and omissions of material fact made by Ann Chery in investing in their Iraq-based Facebook e-marketplace business, placing large Ann Chery product orders, and providing their Facebook e-marketplace link as Ann Chery requested.

118.    Ann Chery's false representations and omissions as alleged herein were the legal cause of harm to Plaintiffs and they have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages; costs; interest; and such other relief as this Court deems just and proper.

## FIFTH CLAIM

### Tortious Interference with an Advantageous Business Relationship

119.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, 84-91, 93-112, and 114-118 as if fully set forth herein.

120.    Al-Saadi set himself apart from traditional brick and mortar stores by entering the Iraqi e-marketplace market and using Facebook to facilitate and grow the sale of Ann Chery products in Iraq. Al-Saadi built a highly profitable business relationship with Facebook for his e-marketplace. Through Plaintiffs' Ann Chery Center

Iraq Facebook Page link, Al-Saadi reached over one million followers and earned substantial profits.

121.    Ann Chery was well aware of Al-Saadi's e-marketplace business platform, having had specific access to and knowledge of Plaintiffs' Ann Chery Center Iraq Facebook Page link information since at least April 2018 when Ann Chery senior officials de la Rosa and Becerra, purportedly in connection with rooting out social media advertising of counterfeit Ann Chery products, asked Al-Saadi to provide the "social media accounts you guys currently use" so that they "will not be in [sic] the radar… And to not be shutted [sic] down..." Al-Saadi promptly provided the Facebook page link for Plaintiffs' Ann Chery Center Facebook Page.

122.    In October 2018, Becerra confirmed, in connection with Al-Saadi's previous disclosure of his Ann Chery Center Iraq Facebook Page: "that's why the [Facebook] account has never been targeted by any of our legal battles" after which Ann Chery official de la Rosa then also wrote and explicitly confirmed to Al-Saadi that *"**Yes ... we have the facebook user you provide us and it is safe.**"* (emphasis added.) With this message, de la Rosa included a screenshot of Plaintiffs' Ann Chery Center Iraq Facebook Page that was "safe." (*See* Exhibit B.)

123.    However, contrary to their assurances, Ann Chery wrongfully caused the Facebook shutdown of Plaintiffs' Ann Chery Center Iraq Facebook Page, intentionally interfering with Plaintiffs' advantageous business relationship with their e-marketplace platform owner, Facebook.

124.    Any attestation to Facebook that Plaintiffs' Ann Chery Center Iraq Facebook Page violated Ann Chery trademarks would have been false, not only because Plaintiffs were an exclusive distributor, but also because Ann Chery authorized Plaintiffs' use of the Ann Chery name, and Ann Chery knew it did not even hold any trademarks in Iraq.

125.    As a result of Ann Chery's tortious interference, Plaintiffs were not only permanently denied access to their successful vehicle for their business, Plaintiffs' Ann

Chery Center Iraq Facebook Page, but their business advertising relationship with Facebook — used to promote Plaintiffs' Ann Chery Center Iraq Facebook Page — was irreversibly harmed. Plaintiffs also lost access to the more than one million followers they had cultivated on Plaintiffs' Ann Chery Center Iraq Facebook Page. Plaintiffs had no way to fully reconstitute their previous customer base.

126.    As a result of Ann Chery's tortious interference with Plaintiffs' advantageous business relationship with Facebook, Plaintiffs lost their business and have suffered substantial damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages costs; interest; and such other relief as this Court deems just, equitable and proper.

## SIXTH CLAIM

### Violation of Florida Deceptive and Unfair Trade Practices Act,
### Fla. Stat. §§ 501.201 *et. seq.*

127.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, 84-91, 93-112, 114-118, and 120-126 as if fully set forth herein.

128.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA" or "Act"), Fla Stat. § 501.201 *et seq.* makes unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1). The Act provides a civil remedy for "a person who has suffered as a result of a violation." Fla. Stat. § 501.211. The provisions of FDUTPA are to be liberally construed "to protect the consuming public and legitimate business enterprises" — such as Plaintiffs in this case — "from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or e-commerce." Fla. Stat. §501.202(2).

129.    Under the Act, "[c]onsumer means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however

denominated; or any other group or combination." Fla. Stat. § 501.203(7). Plaintiffs are therefore "consumers" within the meaning of Act.

130.    Under the Act, "[t]rade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8). Defendants engaged in "trade and commerce" within the meaning of the Act.

131.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's ("FTC's") interpretations of these terms. The FTC has interpreted "deceptive act or practice" to encompass "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment" and an "unfair trade practice" has been interpreted to be one that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

132.    Ann Chery knowingly engaged in deceptive and/or unfair acts in the conduct of their trade with Al-Saadi and Celebrities during their nearly three-year relationship including, among other things (1) their inducement of Al-Saadi to place larger and more expensive orders of Ann Chery branded products by representing that such orders would lead to Al-Saadi's becoming Ann Chery's exclusive distributor in Iraq despite an undisclosed general company policy that it did not have any exclusive distributors save in only very few countries; (2) their breach of the exclusive distributorship agreement and knowingly false representation to Al-Saadi that he was Ann Chery's exclusive distributor in Iraq; (3) their misrepresentations that by providing Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page link, Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page with more than a million followers would be secured and was "safe" from being shut down; and (4) their causing the termination of Plaintiffs' Ann Chery Center Iraq Facebook Page and effectively destroying Plaintiffs' business while attempting to justify their wrongful actions on the

false pretexts that Plaintiffs improperly utilized Ann Chery's name and trademarks and violated the MAPP Agreement, when in fact Plaintiffs were supposed to have had an exclusive distributorship agreement in place that would allow the use of the brand name; Ann Chery authorized Plaintiffs' use of the Ann Chery name on Plaintiffs' Ann Chery Center Iraq Facebook Page; Plaintiffs did not violate the MAPP Agreement; and Ann Chery did not even hold any Ann Chery trademarks in Iraq.

133.    The aforementioned acts by Ann Chery were deceptive because they would likely mislead a person or entity acting reasonably in the circumstances to their detriment, and they did in fact mislead Plaintiffs who acted reasonably in the circumstances to their detriment.

134.    Ann Chery's unfair and deceptive practices caused substantial injury to Plaintiffs, not in the least because Plaintiffs justifiably relied on Ann Chery's misrepresentations of fact when investing in their Iraq-based Facebook e-marketplace business, including but not limited to investing in marketing and infrastructure, as well as placing product orders, and in providing information that they were led to believe would secure Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page, when Ann Chery used that information to do the opposite and caused Plaintiffs' site to be shut down.

135.    The aforementioned acts were unfair because they produced substantial injury to Plaintiffs.

136.    There was no benefit conferred to consumer(s) by Ann Chery's actions that would in any way outweigh the injury caused, and the injury to Plaintiffs could not have been reasonably avoided by Plaintiffs.

137.    Ann Chery's unfair and deceptive trade practices in violation of Fla. Stat. § 501.201 *et seq.,* described above caused Plaintiffs' substantial damages, including the loss of their business, in an amount to be determined at trial.

138.    Pursuant to Fla. Stat. §§ 501.211(1) and 501.2105, Plaintiffs are also entitled to recover from Ann Chery their reasonable attorneys' fees and costs in this litigation arising from Ann Chery's violations alleged herein.

32

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages, attorneys' fees and costs, interest and such other relief as this Court deems just, equitable and proper.

## SEVENTH CLAIM

### Unjust Enrichment

139.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, 84-91, 93-112, 114-118, 120-126, and 128 as if fully set forth herein.

140.    Ann Chery has been unjustly enriched as a result of its conduct alleged herein. Ann Chery understood from the beginning of the parties' relationship that Al-Saadi wanted to be Ann Chery's exclusive distributor in Iraq based on his unique Facebook-based e-marketplace sales platform, and that he would invest heavily in creating and building the market for Ann Chery products in Iraq to support an exclusive distributorship. Ann Chery induced Al-Saadi to make larger orders of inventory from Ann Chery in order to obtain the  exclusive distributorship, and Al-Saadi relied on Ann Chery's representations and inducements in making substantially larger orders and investing heavily in creating and growing the market for Ann Chery products in Iraq.

141.    Al-Saadi's unique and successful marketing efforts created a substantial market in Iraq for Ann Chery products that did not previously exist. Ann Chery knowingly and wrongfully took advantage of Al-Saadi's investments, marketing acumen, and sales which created and then expanded upon a new Ann Chery market in Iraq and provided a platform for Ann Chery to enjoy substantial sales through distributors other than Al-Saadi that continue to this day. Ann Chery also has been unjustly enriched to the extent that Plaintiffs purchased products from Ann Chery that Plaintiffs cannot now sell after Ann Chery caused the shutdown of Plaintiffs' e-marketplace Ann Chery Center Iraq Facebook Page.

142.    Under these circumstances, it would be inequitable for Ann Chery to retain the revenues and profits it has enjoyed from its sales to Plaintiffs and the current

highly profitable marketplace in Iraq for Ann Chery products that Al-Saadi and Celebrities created but can no longer access due to Defendants' conduct.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for unjust enrichment including, but not limited to, the monetary benefits received by Ann Chery at the expense of Plaintiffs; costs; interest; and other such relief as this Court deems just, equitable and proper.

## EIGHTH CLAIM

### Breach of Implied-in-Fact Contract to Eliminate
### Counterfeiters from the Iraqi Market

143.   Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs 1-74, 76-82, 84-91, 93-112, 114-118, 120-126, 128-138, and 140-142  as if fully set forth herein.

144.   As a condition of agreeing to sell merchandise directly to Al-Saadi, Ann Chery required Al-Saadi to execute the MAPP Agreement.

145.   Ann Chery's express purpose in requiring dealers such as Al-Saadi to enter into the MAPP Agreement was "to preserve [Ann Chery's] strong reputation for providing customers with high value products . . . ."

146.   The MAPP Agreement sets pricing parameters for Ann Chery dealers such as Al-Saadi, to ensure its authorized distributors maintain pricing levels that support Ann Chery's high-quality brand: "The MAP for all Ann Chery products shall be no more than 30% higher than the published list price provided, and ALL PRICES can't be even 1 cent lower than the same list price attached."

147.   The MAPP Agreement also provides: "Ann Chery monitors advertised prices of dealers, either directly or via the use of 3rd party agencies or tools.  Dealers are expected to provide reasonable cooperation in any ACI [Ann Chery, Inc.] investigations regarding possible MAP Policy violations.  Hindering, obstructing, delaying, or otherwise failing to cooperate with a ACI MAP Policy investigation is a violation of the MAP Policy."

148.     The MAPP Agreement also provides:  "This MAP Policy has been established by Ann Chery to help ensure the legacy of ACI as a top producer of high quality – high performance shapers and accessories and to protect the reputation of its name and products. The MAP Policy is also designed to ensure dealers and sales representatives have the incentive to invest resources into services for ACI customers."

149.     As noted herein, in 2017, cheap counterfeit Ann Chery branded products began saturating the Iraq market, making it difficult for Al-Saadi to sell genuine products at market prices. Al-Saadi informed Ann Chery about the counterfeiters and advised that they were undermining his market for his authorized sales of Ann Chery products. Ann Chery responded by undertaking to eliminate counterfeiters that were harming Plaintiffs, stating that they were working hard to eliminate counterfeiters in the Iraq market.

150.     In April 2018, de la Rosa and Becerra advised Al-Saadi that Ann Chery was working hard to shut down the unauthorized advertising of their products with particular emphasis on social media. Reciprocally, and at Ann Chery's request, Al-Saadi assisted Ann Chery's anti-counterfeiting campaign by providing Ann Chery with a list of at least a dozen Iraq-based Facebook page links where fake Ann Chery products were being sold, which served to undercut Al-Saadi's legitimate, Ann Chery-sanctioned business.

151.     De la Rosa and Becerra frequently praised Al-Saadi's efforts to help combat counterfeiters in the Iraq region, including, for example, Becerra's statement of thanks that "Thank God we were able to combine our efforts with your cooperation to improve the conditions of your business..." (WhatsApp message of August 22, 2018.) Further, in February 2019, at Ann Chery's request, Plaintiffs, at serious personal risk due to the illegal nature of the counterfeit market, physically purchased counterfeit products from one of the brick and mortar vendors selling fake Ann Chery products, but Ann Chery never even responded with instructions on how and where to send the fakes for Ann Chery's inspection, and did not take the actions necessary to eliminate that major counterfeiter or most others from the market.

35

152.    Despite Ann Chery's promises that it was working hard to eliminate counterfeiters of its products in Iraq and soliciting Al-Saadi's aid in doing so, it failed to take action that would materially reduce counterfeit sales in Iraq. In fact, the Facebook pages Al-Saadi had flagged for de la Rosa and Becerra as those selling counterfeit products were still live on Facebook even after Ann Chery wrongfully caused Plaintiffs' Ann Chery Center Iraq Facebook Page to be deleted. To this day, some of those counterfeit sellers continue to be able to sell Ann Chery products in Iraq, and their presence in the market is one factor making it impossible for Plaintiffs even to dispose of their existing inventory, much less re-create their previous market success.

153.    The parties had an implied-in-fact agreement that Ann Chery would take effective action to eliminate or materially reduce counterfeit sales in the Iraq market reflected by (1) Ann Chery's statements informing Al-Saadi that they would work to eliminate counterfeiters in Iraq; (2) Ann Chery's requests for Al-Saadi's assistance in eliminating counterfeiters, as well Ann Chery's request for Al-Saadi's operative Facebook link for the purported purpose of protecting it from being shut down as Ann Chery attempted to eliminate social media advertising by counterfeiters and other unauthorized sellers; and (3) provisions of the MAPP Agreement including Ann Chery's agreement to "preserve Ann Chery's reputation for providing customers with high value products and after sales support," its promises to monitor dealers' prices and ensure "the legacy of Ann Chery as a top producer of high quality, high performance shapers and accessories and to protect the reputation of its name and products," its requirement that dealers assist in cooperating with Ann Chery investigations, and its stated policy "to ensure dealers and sales representatives have the incentive to invest resources into services for ACI customers."

154.    Ann Chery breached their obligation under the implied-in-fact agreement to take effective action to eliminate counterfeiters from the Iraq market.

155.    As a direct and proximate result of Ann Chery's breach of this implied-in-fact contract, Plaintiffs have suffered and will continue to suffer harm and damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor against Ann Chery for damages; costs; interest; and such other relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues triable by jury, as enumerated and set forth in more detail in this Complaint.

Dated: September 25, 2020            Respectfully submitted,


By:    __/s/ Samuel J. Dubbin, P.A. _____
       **Dubbin & Kravetz, LLP**
       Samuel J. Dubbin, P.A. (FL Bar No. 328189)
       Jeffrey L. Kravetz, P.A. (FL Bar No. 435775)
       1200 Anastasia Avenue, Suite 300
       Coral Gables, Florida 33134
       Telephone:     (305) 371-4700
       Facsimile:     (305) 371-4701
       sdubbin@dubbinkravetz.com
       jkravetz@dubbinkravetz.com

       **ALC Lawyers PC**
       Michael J. Bazyler (CA Bar No. 84398)
       (To apply for admission *pro hac vice*)
       303 N. Glenoaks Boulevard, Suite 200
       Burbank, California 91502
       Telephone:     (213) 384-8500
       Facsimile:     (213) 384-0661
       mbazyler@alclawyers.com


       *Attorneys for Plaintiffs*

# EXHIBIT A



**Exhibit A-1**

# EXHIBIT B



**Exhibit B-1**